I'm here today to request reversal of a ruling of a grant of summary judgment in the District Court to defendants Drake University and Gesine Gerhard. The claims plaintiff continues to pursue, as you're likely aware on this appeal, are FMLA discrimination, FMLA retaliation, ADA retaliation, and Iowa Civil Rights Act retaliation. Margaret Corkrean served as the defense's for 28 years prior to being terminated in October of 2019. In July of 2018, her outgoing boss, Dean Lenz, wrote her a thank you note saying, thank you for your wisdom and assistance these past 11 years. I know you will be a big help to Gesine as you have been to the past five deans. With me gone, you are now the institutional memory. This was consistent with Dean Lenz's feedback directly to Margaret over the years that she served for him. And this was in contradiction to the feedback she received from Dean Gerhard. We request that this decision be reversed because the District Court ignored Margaret's evidence. It discounted Margaret's evidence as self-serving. It failed to view the facts in the light most favorable to Margaret. And it made credibility assessments, primarily recordings that it discussed as being surreptitious. Well, counsel, would you briefly summarize what evidence was put forth to show that there was a discriminatory purpose in rendering the, in making the termination decision here? Yes. I mean, that is the heart of this whole case and where I was headed next to show that the facts were not interpreted in the light most favorable to Margaret Corcoran. And that really boils down to pretext. We can discuss it as causation within the prima facie case requirement, but oftentimes the two analyses are merged. And I think that's helpful here just to cut straight to the heart of the matter and go to pretext. And the things that indicate that Ms. Corcoran was not terminated for a legitimate non-discriminatory reason include that she complained no fewer than five times and Drake in contravention of its own written policies and three promises to her failed to undertake any investigation. And what we got instead... Give some context to what you're describing here. What transpired? What action did she seek or was denied? What action did the school take against her? I'm just, I don't want to wanting for you to flesh out the factual foundation for your claims. Absolutely. So, I should start with Dean Gerhardt started as her supervisor in July of 2018. So Dean Lenz leaves, Dean Gerhardt comes on board. In the background, there's some chatter and emails we'll get to later between Dean Gerhardt and also a new provost through Madison. But face-to-face with Margaret, there's a meeting in September where Dean Gerhardt criticizes Margaret's time out of the office. Margaret describes her health conditions to Dean Gerhardt and describes that she has multiple sclerosis as well as problems with her back and problems with her neck. And Dean Gerhardt says to her, I don't care if you have MS, you need to be in the office from 8 to 4.30. This is the primary point that launches everything in this case. So Ms. Corcoran after that ends up crying and human resources to Deb Wiley who manages human resources. Were there specific leave requests made that were denied? No. So we're not dealing with an entitlement claim. We're dealing primarily with discrimination and retaliation under the FMLA. And what was the discriminatory act? Termination. We're fast-forwarding to termination and the evidence that we have of discriminatory motive all boils down to a record of emails behind the scenes that show that every time that Margaret Corcoran complained, HR and the managers above Margaret Corcoran were working to set her up for job performance concerns, not to listen to her, not to investigate what was happening with Dean Gerhardt and whether Dean Gerhardt was legitimately allowing her the time out of the office that she needed or not. And so we're not discussing whether she got the FMLA time that she needed. We admit that she did get that FMLA time, but to us it's very important that every complaint she made and we had detailed this in a retaliation timeline in our briefing, every complaint that she made was followed by additional performance concerns being generated in the background. Well, counsel, what about, first of all, a big point, actually they never really worked well together. I'll wait until you're back. Actually they never really worked well together. We fortunately have a recording in January 2019, months before all this, where Dean Gerhardt is complaining about her hours, very plainly. And then we have, of course, as you know, many other recordings and memos over time about just her work performance. And of course, I think that's where the district court rested it was on causation that the termination was caused by all this other stuff, by the bad work performance, not by any retaliation. I think that's a valid point in the sense that is that a defense that can maybe aid, is that something that somebody can interpret from the recordings and the documents? But to us, that's a classic credibility determination, classic defense for the jury to consider because it's very interconnected with the facts. So namely, was the relationship between the two of them something that caused the termination or was it the FMLA use and absences? If we stick with the shifting burden analysis, and I think this is where you perhaps were going before I altered your course early on, is the pretext is they've offered their rationale for termination as performance based. And what's your evidence for that being pretextual? Again, I think the primary thing is the failure to follow their own policies. And when I say that they promised her that they would investigate her formal complaint, you can see that at appendix page 45, appendix page 587, the end of the July 16th recording. So it's not only their written policies, but then they promise her in writing, if you make a formal complaint, and probably they should have acted under the policy with regard to an informal complaint, so we can discuss that too. But let's just go straight to the formal complaint that she made on July 10th because that was a detailed complaint in writing. After that point, they admit in the responses to our facts that they never investigated that formal written complaint after promising her three times and setting forth in their policy that they would. So our additional fact 37 at appendix page 775, they admit they did no investigation and they admit that was contrary to their policies. So under this court's case law, Edwards v. Hyland, Roberts-Derry was actually a case cited by the district court. That holds that an employer's failure to follow its own policies is demonstrative of pretext. But we also have this chatter. Again, I'm trying to connect it because you're aware of the course June 24 memo about the June 18 meeting and you're aware of the June 28 meeting where they keep saying FMLA and job performance issues are separate. So it looks to me like we have months of them saying that they are separate. Now, how do you get them tied together? I think they tie together in the July 16th memo and that recording. Because that's where she is advised of her FMLA rights and she's disciplined within the same meeting and the same document. And that follows, that July 16th memorandum and meeting follows her July 10th complaint. We could go back and look at each instance in the retaliation timeline where she complains and then right after that there's Counsel, in the, in the, I have it in front of me, in the July 16 memo, everything they say there, of course they produced this, but everything they say there says FMLA is separate and they're going to go by it and here are the FMLA rules. So tell me why that's wrong. And then they have that long plan for improvement, which looks like a normal business plan for improvement. Well, again, these are words out of their mouths. Do we take them at face value or do we listen to the recording where Margaret goes on to share with Deb Wiley during that July 16th meeting that she still feels like she's being harassed, that she's not free to take her FMLA leave. And again, they don't, they don't do anything except give her this So the two are very interconnected. And I think if you're looking at this, I would look at it primarily as a retaliation case because of the timeline and the fact that each and every complaint that she makes to Human Resources is followed by them collecting information on her job performance and not once is it followed by what they're supposed to do, which is investigate these complaints. And by the way, what happens if they would investigate the complaint? If they did investigate it, what record would we have at that point here today? It could have benefited the university greatly, but we also have some material in the record to show that it would not have. We have the chair of the English department making allegations that are similar to Ms. Corcoran's about Gesina's treatment of employees that come up in an interview. These are the types of things that would have been unearthed by Human Resources if they had taken the time to listen to Margaret Corcoran instead of developing a record to fire her, which is one way to read the evidence. And as we've said, the evidence should be construed in the light most favorable to the appellant. Thank you very much. I'm going to reserve the remainder for rebuttal. Thanks. Thank you, Mr. Flann. Ms. Grief? Good morning, and may it please the Court. As indicated, my name is Rebecca Grief, and I'm here this morning representing Defendant Appelese, Drake University, and Gesina Gerhart in this appeal from the Honorable Rebecca Goodgame Ebbinger's grant of summary judgment on February 28th of 2022. And as noted in the briefing and in the proceedings this morning, it appears Ms. Corcoran only appeals a handful of her claims that were initially raised to the district court, some of which were dismissed at the summary judgment stage, some of which were dismissed by the Court on Summary Judgment. And at this point, the only claims being appealed to this Court are retaliation and discrimination under the Family and Medical Leave Act, the FMLA, and retaliation under the Iowa Civil Rights Act and Americans with Disabilities Act. And the reason I think that's important to note is that a lot of the briefing, a lot of the arguments, a lot of the facts raised in the briefing and even in the opening argument this morning may be arguably relevant, related, unrelated to some of these other claims, but we're not arguing about harassment today. We're not arguing about disability discrimination today. Those are claims that were raised and dismissed by the district court and are not on appeal today. So we're only looking at those four particular claims. And although Ms. Corcoran may posit that this is a factually complex case in which credibility determinations were made, weighing record evidence is necessary before a jury, it simply is not. And the district court in this case properly exercised well-established precedents in employment discrimination law, both in federal law for the FMLA, state law, the Iowa Civil Rights Act, federal law, the Americans with Disabilities Act, and civil rules of procedure on Summary Judgment Rule 56. And we submit defendants, Drake University and Dean Gerhart, that after review of the party's briefing and oral arguments, there are really four main findings that rise out of the briefing and arguments today. The first is one that was mentioned by Your Honors in the opening argument, which is that only one adverse action is at issue here, and that is the termination of Plaintiff Margaret Corcoran on October 6th of 2019. There are not other adverse actions or alleged harassment or hostile work environment at issue in this case. Second, at the district court and on appeal, Ms. Corcoran does not dispute the proffered and documented reasons for her termination on October 7th of 2019, which were documented in a lengthy termination memo and explained to her on that date. And through discovery in this case, through briefing, through arguments, at no time has the plaintiff's argument as to whether the university followed its policies in the termination. We would submit that, yes, it was raised and questioned, just like it was in the preceding argument here, whether or not Drake University followed to the letter its particular policy on discrimination and harassment. But we would submit that that's a red herring issue and argument, as it was found by the district court in this case. It's simply not relevant. First, it's not relevant because Title VII does not require more than appropriate response and remedial action taken in response to a claim of discrimination and harassment. Second, just because somebody claims harassment and discrimination doesn't mean that's actually what's going on. And the district court pointed out in this case that although Ms. Corcoran used the words harassment and discrimination multiple times, that legally triggers no more than an obligation to determine whether or not there's an appropriate and remedial action that needs to be taken. And when we're discussing specifically Ms. Corcoran's July 10th of 2019 written formal complaint, the testimony in this case was that that the HR department had the information it needed to make that appropriate and remedial response. They had been involved with both of the parties to the dispute, Dean Gerhardt and Plaintiff Corcoran, for months. Ms. Corcoran submitted a multi-page single-spaced complaint that well laid out what her concerns were and what she called harassment and discrimination. And as a result, the HR department prepared and provided the July 19th, 2019 memorandum, and we have a recording of that meeting, in which the HR department laid out three particular action steps to resolve any complaint that Ms. Corcoran was making. And although opposing counsel in her opening argument indicated nothing was done or nothing was done to respond to the complaint or help Ms. Corcoran, she in fact testified in her deposition that she was aware of those three action steps, that they were, quote, good, and that there was no evidence following that meeting that there was any criticism of her FMLA usage, no criticism or mention of her medical conditions, no denial of any FMLA leave, and she made no other internal or external complaints of harassment and discrimination between July 19th of 2019 and her termination on October 7th. An NLRB complaint, counsel, in September, right? That is correct. She did not make an internal or external complaint of harassment or discrimination, but she did make a complaint in September to the NLRB, which we submit is not related to the issues of harassment and discrimination. It's a completely separate issue that was handled by the NLRB. So was the, were any university policies not complied with? We would submit that no. You could argue about what constitutes an investigation and what constitutes a particular response, and although the university does have a policy indicating that complaints of discrimination and harassment will be investigated, I think what an investigation requires could certainly be open to interpretation. So is this a fact question? It is not a fact question we submit, and it's certainly not a material fact question to the issues in this particular case. And that's why we indicated it's a red herring, because it does not generate a material disputed fact on the actual elements that are appeal in this case. And that's something that we submit over to the NLRB. What if a fact finder disagreed with you and said that there's a university policy that requires investigation and this was not a good faith investigation? This was not an actual investigation. Do you think that would be an immaterial fact if it was found by a fact finder? We do not, Your Honor, because even if that were a dispute or even if that was an arguable interpretation of the facts, for the reasons I just mentioned, it's irrelevant to the actual legal elements at issue here. And that's because regardless of whether there was a full-fledged investigation in which different parties were interviewed or different evidence was obtained, the results of the investigation are undisputedly appropriate and remedial and responsive, as I indicated a moment ago. And Ms. Corcoran, in her deposition, agreed that appropriate and remedial action steps were taken, that they were good, and that they were followed essentially until her termination. But if the policies were not followed, would that be, and a fact finder found they were not followed, wouldn't that be evidence of pretext of the actual reason for the termination? They would not, Your Honor, because the issues that were raised in the complaint in the investigation are wholly unrelated to the single adverse action at issue here, which is the termination from employment. This investigation occurred in July of 2019. Her termination occurred on October 7th of 2019 for completely separate, documented, and legitimate reasons. And also on pretext, which we do want to note, plaintiff did not appeal or address in her initial brief. So we submit the issue of pretext was essentially waived as far as an appeal issue under court precedence. The two are completely unrelated. And under one of these, this Court's decisions, which is Logan, the Liberty Health Care Corps, it indicates that it actually takes more evidence of pretext than a prima facie case in order to determine whether or not pretext exists because that evidence is taken in light of the defendant and the employer's proffered reason for the termination. And in this case, the proffered, undisputed reason for her termination is that Margaret Corcoran engaged in repeated, unexcused, nonprotected attendance issues. So she was not at work. She was absent. She was tardy after she had been warned not to be and indicated in her action plan that she would not be on a going-forward basis. That is undisputed. She also continued to She has not disputed that was the case. Even in her self-serving affidavit, that the district Counsel, you said a magic word there, self-serving. Yes. Did the district court use the term self-serving and say she couldn't be believed because they were self-serving? Is the term self-serving in the district court's opinion? That's the factual thing. I don't know. Go ahead. That is a great question. I don't know off the top of my head if that particular phraseology is used, but And then I should, the follow-up is, did she in effect say that? Yes. And what the district court cited to, as we did also in our brief on appeal, is that there's a well-established line of case law that affidavits that are submitted that are, and I'll use the phrase self-serving because that does come out of the case law, are inadmissible to generate a material factual issue with this case. So I did not want to The way the United States Supreme Court has reversed decisions, crucially, one paragraph, reversing appellate courts if they say, well, self-serving means we can't believe the plaintiff's arguments. Are you aware of those cases? But proceed if you need to. Yeah. I couldn't necessarily speak to those in particular, but what I can speak to are the cases that were cited by the district court and also in our briefing on this particular issue of the affidavit. And plaintiff argued that some of these were distinguishable, ANDA and Garter Mountain, but we indicate that even if that particular phraseology is concerning, there is strong case law under the estate of grave decision we cited from Iowa, as well as Stewart, which is an Eighth Circuit case that indicates a contradictory affidavit rule. Do you know the date of the Stewart case? What was that? Do you know the date of the Stewart case? I have it in my brief, but I didn't jot it down specifically in my notes. I know we did a case site to make sure that all of that was accurate case law. And that is an additional issue with the affidavit that was submitted at the 11th hour in summary judgment by Ms. Corcoran, is that it was contradictory. It was contradictory to some of the evidence in this case. And that also ties into a key issue that plaintiff raised in her opening argument regarding this allegation that the district court made credibility determinations. It did not. And particularly on this issue of audio recordings, just because the district court used the term surreptitious does not mean the district court was making credibility determinations. They're legal in Iowa, right? One-party recordings are legal in Iowa, right? It's a one-party state. Do you know what I'm referring to? Yes. Yes. Okay. Proceed. It's not criminally. Well, the district court surreptitious is a little bit misleading when they're legal under state law. Proceed. And they are legal under state law. It's not criminal. There has not been any kind of criminal proceedings for making this recording. That applies in civil law, too, counsel, the recordings. Proceed. Yes. Divorce proceedings. Proceed. And in this case, it was a fact. It was an undisputed fact. And there was testimony from Plaintiff Corcoran that she made these audio recordings. There was testimony from Dean Gerhart and the others there that they were not aware they were being recorded. That's not a credibility assessment. That's not a judicial weighing. That's an undisputed fact that one party knew that the recordings were being made and the other did not. And where that became key to the district court is that that is, unlike a lot of employment discrimination cases where it's he said, she said regarding what occurred in meetings, in this case, we actually have contemporaneous audio recordings of 32 of the one-on-one meetings between Dean Gerhart and Plaintiff Corcoran in which Corcoran testified the alleged discrimination, harassment, retaliatory conduct occurred. And nowhere in any of those recordings has Plaintiff Corcoran indicated that the comments or statements or criticisms that she says she endured actually occurred. And so that was not a credibility assessment or judicial assessment. That was pointing out the undisputed facts that these recordings occurred. And what is contained content-wise in the recording is contradictory to Plaintiff's It's not a judicial assessment. It is actually indicating the undisputed facts. And in my last few seconds, I did want to make sure I tied back into your question, Judge Shepard, on the issue of pretext. Because even though we indicate we believe it was not properly appealed, just because Drake University may or may not have strictly to the letter followed its policy in investigating her July 29th of 2019 complaint, that is not sufficient evidence of pretext for the termination decision that occurred in October — on October 7th of 2019 and in light of employers' justification that has never been disputed. And while we haven't been able to speak to it specifically, the district court's ruling on a complete lack of causal connection is well established in this case and supported by the evidence, and we respectfully ask this Court affirm the district court's grant of summary judgment. Thank you. Thank you, Ms. Reeve. Thank you, Judges. I was actually surprised by one of those questions about self-serving affidavits because, man, that is all over the district court opinion. Did she use the term self-serving? All over. No, wait. Did she use the term, quote, self-serving? Yes. Unquote. Yes. And cites the case law that's completely inapposite, and I can't believe I'm standing in the Eighth Circuit Court of Appeals arguing about self-serving affidavits, actually, in this case, where our affidavit — you don't even have to conserve it, actually, to get to pretext. It's, like, not even important. But it really was more or less a direct examination in an affidavit, which gave background context and other such things. It did not contradict her deposition testimony, one iota. I'm very aware of that doctrine also. So I just — I can't believe that we're talking about self-serving affidavits, because the case law that is cited by the district court in that regard, and she does use that term widely, in addition to calling the recording surreptitious and saying that we have to analyze the recordings, knowing that Margaret knew that she was being recorded and the other parties didn't, which is so clearly a credibility determination. Well, I think it increases the credibility of the other side, by the way. Well, of course it does. But they can argue that at trial, right? I mean, they've got these recordings. They talked about them playing them at trial. That's what this is. This is a trial on paper. Unless it's so one-sided, unless the evidence is so one-sided, that no reasonable jury could believe. Well, that's certainly how I would present it. Another thing I was completely surprised about back there was this idea about this — this hemming and hawing about, you know, did they follow their policies or did they not? I mean, the deposition testimony from Director Mary Alice Hill that we submitted, it starts at page 479 or so, and the appendix is very clear. I asked her, and I believe you said that you do not consider this a complaint of harassment. And I asked her if she did an investigation, and she testified she did not believe that it was necessary, because Deb Wiley, the HR rep for the college, had been sitting in the meetings, in many meetings. And what I say to that is Ms. Wiley was completely and utterly biased, because behind the scenes in the retaliation timeline that we discussed, you can see that there is emails flying back and forth about writing Margaret up. She's an unbiased witness. That's what she is. She did not perform any independent investigation as the policies require. If you'd like to look at those policies, they're at appendix page 529. And of course, from our standpoint, the failure to follow their own policies and promises, by the way, is absolutely not a red herring, but it goes directly to the issue of pretext. The recordings are mentioned again, and there's this idea that you can listen to the recordings and not hear any of the dynamic between the two of them or not hear that it's harassing or discriminatory. I beg to differ, and I would refer the Court to the January 3rd Judge Fenton asked about earlier. I think there are different interpretations possible from that recording. You can view this as people who just didn't get along, or you can view Dean Gerhardt as asking and challenging Margaret about whether certain of her absences were actually FMLA absences, which, by the way, she does in the emails, too. So that does connect things to the FMLA. But there's no mention of FMLA in the January meeting, right? Absolutely none, right? Time out, I remember it as there's discussion of time out of the office. Yes, a lot. And the purpose that it was tracked, and that there's like a yes, it is, no, it isn't, yes, it is, no, it isn't. And I believe that referred to FMLA time. And then there's the July 9th recording that is that, in fact, the impetus. I see I've run out of time here. May I finish my thought? Yes. The July 9th recording that's the impetus for the NLRB complaint where Dean Gerhardt could be interpreted by some to be harassing, discriminatory, when she instructs Margaret that she should not talk to other people, that it's unprofessional. She's heard she's doing that. And if she does it again, it's going to be on the list. Thank you very much for your time.